**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

July 7, 2022

**BY EMAIL (UNREDACTED)**
**BY ECF (REDACTED)**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE:   United States v. Marcus Frazier,**
      **21 Cr. 649 (VEC)**

Dear Judge Caproni:

    The Court should sentence Marcus Frazier to time served followed by one-year home detention and a total of three years' supervised release. This sentence adequately punishes Mr. Frazier and promotes respect for the law given his mitigating personal circumstances, extraordinary performance on pre-trial release, and the hefty monetary penalties he has agreed to pay. See Consent Restitution Order, Attachment to Gov't Sentencing Memorandum (Dkt. No. 30-1).

    **I.**    **Overview**

    Starting in June 2020, and within weeks of being laid off at the outset of the COVID-19 pandemic, Mr. Frazier did something really stupid: he submitted bogus applications to various lenders for emergency Paycheck Protection Program (PPP) loans from the Small Business Administration (SBA). Mr. Frazier's plan was as boneheaded as it was uncomplicated. He gave several lenders fake bank statements, corporate information, and employee credentials to ultimately obtain approximately $1,217,499 from a government program designed to help real companies and employers stay afloat during unprecedented public-health-related lockdowns and social panic. Between June 18, 2020, and April 7, 2021, of the PPP funds Mr. Frazier actually obtained, he spent approximately $350,000 on personal expenses, including hotels, restaurants, transportation, and clothing. The remaining funds, approximately $850,000, were not spent and were seized by federal law enforcement on or about April 26, 2021.

    This is the thrust of Mr. Frazier's offense conduct and it is certainly not pretty. However, it is far from his full story.

From a young age, Mr. Frazier was determined to overcome the challenging financial and social circumstances into which he was born—a mother with multiple sclerosis, an abusive father, and a grandmother/foster mother who relied on social security benefits to barely scrape by. Over time, as Mr. Frazier's determination to escape his family's dysfunction transformed into an obsession, his self-worth and self-esteem became inextricably intertwined with very public displays of wealth and success. In May 2020, Mr. Frazier was unceremoniously laid off from a financial firm due to COVID-related downsizing. He began drinking regularly as he became further isolated in New York City, estranged from his family and living a world away from his son and his son's mother, who reside in Australia. Panicked over finding a new job and desperate to sustain the carefully-curated image of himself as a wealthy professional, Mr. Frazier's preoccupation with affluence and social status reached its climax and culminated in his scheme to defraud the SBA.

But contrary to the Government's reductionist argument, that Mr. Frazier's scheme was borne out of pure selfishness and greed, Mr. Frazier's desperate scheme was the product of years of depression, personal loss, and unaddressed trauma. Indeed, while the instant case is Mr. Frazier's first ever criminal conviction, he has grappled for years with low self-esteem, chronic feelings of inferiority and deficiency, covert grandiosity, and a hypersensitivity to loss and failure—psychological symptoms contributing not only to his SBA fraud, but also to more minor instances of financial misconduct in the past, which comprise the second wire fraud count in the Information. See generally Dr. Claude Patrice Francois Psychological Report, Exhibit A.

This case has been a true wake-up call for Mr. Frazier, and he has done everything possible to redeem himself since his arrest. Mr. Frazier's willingness to accept responsibility and plead guilty was unwavering from the moment he first appeared in court. Mr. Frazier not only spared the Government from the hassle of indicting him, but he also did not seek the Rule 16 discovery to which he was otherwise entitled, saving the Government significant time and resources. And when a search of his electronic devices uncovered other smaller acts of fraud against financial institutions in 2018 and 2019—activities that would have unlikely remained undiscovered but for the instant offense—Mr. Frazier readily accepted responsibility and pleaded guilty to them as well.

Mr. Frazier, who does not have any co-signers to his personal recognizance bond, has also been a perfect and productive pre-trial releasee. He has held a job at a consulting firm in New York City and is thriving in this new role. With his earnings to date, Mr. Frazier has set aside $5,000 towards an initial restitution payment, which he intends to make on July 18, 2022, the date of sentencing.

Mr. Frazier also continues to enthusiastically participate in mental health

treatment and Alcoholics Anonymous, and he has volunteered with various community-based organizations. He now possesses a more robust insight into his mental health needs and challenges, and he will build on these successes through continued talk therapy, substance abuse counseling, and psychological treatment.

Mr. Frazier has used the past year-and-a-half to refocus on his relationship with his son and the boy's mother. As a result of this case and COVID-related travel restrictions, it has been two years since Mr. Frazier has traveled to Australia to see his son and co-parent, and he is humbled by their continued support and love despite the circumstances created by his poor decision-making. Mr. Frazier's son is already showing signs of increased emotional distress related to his father's prolonged physical absence (see Exhibit B), and Mr. Frazier is committed to being a better and more present father, i.e., to being the type of father that he never had. Having fully grappled with the impact of his choices on his family, Mr. Frazier is terrified at the prospect of being imprisoned and facing a more formidable separation from them.

Against this backdrop, sending Mr. Frazier to prison for any amount of time would be greater than necessary to punish him, promote respect for the law, and provide him with needed medical care and other treatment in the most effective manner. A term of imprisonment is particularly inappropriate given his overwhelmingly positive adjustment to pre-trial release, steady employment, and the substantial economic penalties associated with his crime. Instead, the Court should sentence Mr. Frazier to time-served, followed by three years' supervised release, with the first year to be spent on home detention, and restitution.

## II.   Procedural History

Mr. Frazier was arrested on April 28, 2021 and presented before Magistrate Judge Gabriel W. Gorenstein on a seven-count complaint. Dkt. No. 1. On consent, Mr. Frazier was released the same day on a $250,000 personal recognizance bond to be co-signed by two financially responsible people. Dkt. No. 4. After undersigned counsel conveyed to the Government Mr. Frazier's readiness to plead guilty to an information and without the need for Rule 16 discovery,[1] the Government consented to a modification of Mr. Frazier's bail conditions permitting him to remain on pre-trial release under "strict supervision" but without the need for any co-signers to his personal-recognizance bond. Mr. Frazier has scrupulously complied with the terms of his pre-trial release without incurring a single infraction. PSR ¶ 7.

---

[1] The defense received a very small set of discovery in this case, namely the recorded telephone communication between Mr. Frazer and an agent of the Small Business Administration referenced in ¶12 of the Complaint and summary loss-amount charts prepared by the Government.

Ultimately, on October 25, 2021, Mr. Frazier pleaded guilty to an information charging two counts of wire fraud in violation of 18 U.S.C. § 1343 and pursuant to the terms of a negotiated written plea agreement.

### III. Marcus Frazier's Personal Background, Record, and Circumstances

#### A. Mr. Frazier's difficult and traumatic childhood was punctuated by his mother's multiple sclerosis, his exposure to domestic violence, child protection services, and his father's sudden death.

Born in 1973 in Columbia, South Carolina, Mr. Frazer had two siblings and grew up in a challenging home environment. When Mr. Frazier was very young, his mother, Yvonne Frazier, was diagnosed with multiple sclerosis (MS). Mr. Frazier cannot remember a time in which his mother was not suffering physically and mentally from MS. Her husband, George Frazier, amplified her suffering through physical abuse that Mr. Frazier witnessed. On one occasion, Mr. Frazier recalls his father picking up his wheel-chair-bound mother and dropping her on the floor. As a result, Mr. Frazier grew up conflicted about his father, someone he so desperately wanted to see as a role model. As Dr. Claude Patrice Francois writes in her psychological assessment of Mr. Frazer:

> He believes that the pressure on his father to care and provide for an ailing spouse and young children caused him to engage in physical violence towards his mother and older brother. He recalled an incident wherein his father picked up his wheelchair-bound mother and dropped her on the ground. Queried as to how he felt when his father would become violent, he stated '*I was scared because I didn't understand. Also, as a boy, you look at your father like a king. My father was a God to me. My older brother hated my father. He was older. I saw less.*'

Ex. A at 2.

Eventually, the authorities intervened, and Mr. Frazier and his siblings, were transferred to the foster care system. During this time, Mr. Frazier recalls really missing his home. He was only four years old when he was removed from his parents' care, and he craved their presence and attention. As Dr. Francois explains:

> Although [Mr. Frazier] was not mistreated at the foster care placement, he recalled missing home. He shared that he would sit outside for hours and watch the road in the hopes that he would catch the familiar sight of his grandmother's car coming to pick them up.

4

Ex. A at Page 2.

Mr. Frazier's mother's physical disabilities prevented her from assuming full custody of Mr. Frazier and his siblings. Consequently, and given the clearly untenable alternative of leaving the children in Mr. Frazier's father's care, Mr. Frazier's parents gave up their parental rights and their children were adopted by Mr. Frazier's maternal grandmother. As part of the terms of the adoption, George Frazier was not allowed to have any contact with his children. Mr. Frazier, despite being so young, vividly recalls a supervised visit in which his father told all of his children that he would no longer be a part of their lives. Although Mr. Frazier and his siblings were happy to be with their maternal grandmother, this was still devastating news.

Life was not easy with Mr. Frazier's grandmother, either. They lived in a two-bedroom trailer and had very little income. Mr. Frazier's mother didn't work because of her disability and his grandmother relied on social security benefits. The children continued to receive visits from the relevant governmental authorities for two to three years after the adoption. The visits terrified Mr. Frazier; he worried that he would be taken away from his grandmother. As he recounted to Dr. Francois:

> *'When we got to my grandmother's house, I almost had PTSD, constant fear of the social worker coming and taking us. She could show up at any time to check up on the house. She would write a report and if the report was wrong, they could take us. I was terrified. I didn't know what she was writing.'*

Ex. A at 2.

Mr. Frazier felt ashamed and embarrassed over his family's situation—their dysfunction, poverty, and regular contact with children's services. He wanted a normal life. To mask his humiliation, Mr. Frazier fabricated an image of himself to present to the world. Dr. Francois writes:

> He coped with his shame by crafting an image to present to the world. He noted *'I remember being embarrassed of our living conditions. I was not telling them we were poor. I started exaggerating stuff, like we had a big house as opposed to living in a two-bedroom trailer. I was embarrassed that my mom was sick. I told them my mom had a job. I can't remember what I said for my dad….'*

Ex. A at 2.

When Mr. Frazier was 10 years old, his father was found dead in a pool. It

5

was a shocking development for the family, especially because they had not seen him in years. Although George Frazier's death was ruled an accident, Mr. Frazier's family suspected that he had been killed over a financial dispute. Despite being separated for some time, Mr. Frazier had long fantasized about his family reuniting. He thought that one day they would all live together in a big house. This was all cut short by his father's sudden death.

### B. Although he was a good student and hard worker, Mr. Frazier's successes were often overshadowed by his inability to cope with adversity and failure, and he frequently resorted to lying to avoid problems in his life.

Through all of the tumult, Mr. Frazier found respite in his education. He believed that getting degrees would be his way out of poverty and despair. Mr. Frazier was a diligent student and graduated from high school at the top of his class. In one of his proudest moments, Mr. Frazier was admitted to Howard University, with a partial tuition scholarship. For the first time in his life, Mr. Frazier felt like he had finally "made it."

During his first year of college, Mr. Frazier worked hard and enjoyed living away from home. In some respects, college was the great equalizer; everyone lived in dormitories, took the same classes, and at the same food. It felt like a real fresh start. For a while, Mr. Frazier thrived in this environment. But after his first year, Mr. Frazier had a tuition balance of $900—a debt he was simply unable to pay. As a result, Mr. Frazier was forced to drop out. That experience crushed him. But rather than face his family, tell them the truth, and rebound from the setback, Mr. Frazier lied and told them that he was still enrolled at Howard. Dr. Francois elaborates:

> He stated that he did not tell his family about being forced to drop out for financial reasons because '*I didn't want to disappoint my mother or my family. I didn't want to tell them I didn't have the money. No one had the money*'. For a time, Mr. Frazier continued living in the dormitories in spite of no longer being enrolled. He obtained entry level jobs and often sent money to support his mother as her health was declining. He struggled financially. He recalled that he was homeless for a period for 8 months in 1995. He slept at the homes of his friends or at times was forced to sleep in his car.

Ex. A at 3.

In 1998, Mr. Frazier landed a job at a tech company. Although he began in the mailroom, Mr. Frazier capitalized on the opportunity to learn about network engineering. He immersed himself in the subject matter and became conversant in

the technicalities of the job. Eventually, senior staff members recognized Mr. Frazier's eagerness and potential. They encouraged Mr. Frazier to apply for a promotion that would provide on-the-job training, but that also required a college degree. Mr. Frazier knew it was wrong, but he lied about having graduated from college. He was not only desperate for the job, but he also did not want to disappoint or embarrass himself in front of the company's senior staff. He planned on securing the employment, making some money, and then attending school at night to finish his degree. Mr. Frazier held this position for a few years before getting laid off in 2000. Onward, Mr. Frazier continued to work at technology firms, and later at financial companies, and became accustomed to fudging his educational background—a problem that never surfaced because Mr. Frazier was such a hardworking employee.

In spite of earning modest to high salaries, Mr. Frazier frequently found himself in financial distress, living beyond his means. Sometimes, his failure to save and budget drove him to homelessness, a secret he went to great lengths to protect by constantly lying about his employment status and finances, including to his romantic partners. Ex. A at 3-4.

Mr. Frazier's mother's health began to decline more aggressively in 1995. Over time, she was relocated to a nursing home and had a feeding tube installed. Mr. Frazier did not cope well with his mother's drawn-out demise and avoided going to visit her. She eventually died in 2003. The whole experience drove an even larger wedge between Mr. Frazier and his siblings, and he redoubled his commitment to his professional aspirations.

Eventually, Mr. Frazier acquired his bachelor's and master's degrees and felt a sense of relief. He no longer had to misrepresent his education. Soon, Mr. Frazier obtained a high-level position as a project manager at a financial firm in New York City. He began living in an upscale apartment in lower Manhattan and spent a lot of money on eating out, purchasing art, and socializing with other high-level finance professionals. In retrospect, Mr. Frazier should have lived more prudently and saved his money. Instead, when he was laid off in May 2020 due to financial repercussions of the COVID-19 pandemic, Mr. Frazier found himself in an uncomfortably familiar position: unemployed, underfunded, and overspent. And he reacted to this problem in the most self-destructive way possible.

> **C. Mr. Frazier made the biggest mistake of his life when he defrauded the SBA to improperly obtain and spend COVID-19-related paycheck protection loans—a mistake directly attributable to self-destructive coping mechanisms he developed as a response to trauma, anxiety, and low self-esteem.**

7

When Mr. Frazier found himself unemployed in May 2020, he completely panicked. In spite of his high-end salary, Mr. Frazier had barely saved for three months' worth of expenses, and he was ill-equipped to immediately ditch the lifestyle he had so carefully cultivated. Although Mr. Frazier tried to reassure himself that he could downsize, adjust his lifestyle, and scrape by until he found a new job, he simply did not have the coping skills or mechanisms to act on this rationale. See infra. Instead, he capitulated to his paranoia of becoming homeless again and succumbed to his fear, self-loathing, embarrassment, and anxiety: he lied to the SBA and submitted fake applications, bank statements, and other materials to obtain emergency PPP loans.

As evidenced by his immediate willingness to plead guilty and by his letter to the Court, Mr. Frazier accepts full responsibility for his conduct and is genuinely sorry. As he wrote to Your Honor:

> Despite my efforts to be an exemplary person and father, I failed that mission when I broke the law. My decision to commit fraud and improperly obtain funds the federal government had provided to keep millions of Americans afloat during the height of COVID-19 was impulsive and motived by a desperate attempt to maintain a sense of stability after I lost my own job at the start of the pandemic. I felt like I needed to maintain an image of success in order to be deemed worth, and in that state of anxiety, I behaved extremely poorly. There is no justification for what I did. We are a nation of laws, and I broke the social contract. I am deeply remorseful.

Marcus Frazier's Letter to the Court, Exhibit C.

Crucially, however, Mr. Frazier has used the past year following his arrest to gain a better understanding of his mental health needs and how his self-destructive approach to problem-solving landed him in front of the Court. In particular, Mr. Frazier agreed to be evaluated by Dr. Francois in July 2021, who explains the direct relationship between his life experiences and his plainly negative and counterproductive reactions to stress:

> Mr. Frazier's formative years were shaped by a number of traumatic factors including a violent household wherein he repeatedly witnessed his father physical assaults of his paralyzed mother, the sudden dissolution of his nuclear family and placement into foster care, the loss of his father first through adoption and later to death, his mother's debilitating illness and poverty. These factors deeply shaped the development of his sense of self and others. Internally, Mr. Frazier struggles with a deep sense of shame, vulnerability, feeling less than.

8

> He feels a sense of insecurity both within himself and in the environment given his early childhood experiences of sudden and radical changes to his family life. …
>
> As his career took off, he began to socialize with highly successful individuals. He concocted various stories about his origins. For example, he would claim that his mother was an attorney and that his father was a physician in a recreation of the main characters of the Cosby Show. It is as if by gaining admission to these elite circles, Mr. Frazier sought to transform his very being. He stated: *'living outside my means…pretending to be someone I wasn't…some sort of façade…trying to fit into the crowd also understanding the power of having a certain network, being able to fit into a certain network. At Fannie Mae, I'm around very powerful people, around traders, the CEO knew who I was…a lot of it goes to my childhood stuff, the shame and the embarrassment. I was ashamed of my background…I had to cover up for not being educated, trying to get stability, trying to escape the chaos…I needed to be able to move in these groups. I was chasing stability.'*

Ex. A at 4-5.

Essentially, "[w]hen intelligence, network and hard work alone do not yield visible signs of success, he relies on maladaptive behaviors such as misrepresenting his education or engaging in high-risk financial behaviors such as those manifested by the instant offense." Id. at 5. Thus, from a clinical perspective, it is clear that "[w]hen Mr. Frazier is faced with a situation wherein he experiences a major loss that he cannot immediately address, his feelings of shame intensify and he experiences acute episodes of depression." Id. And while those "episodes of a deep descent into despair and hopelessness are often temporary," Mr. Frazier "climbs out of those states by relying on his traditional coping mechanism of achievement and status seeking." Ex. A at 6.

Indeed, while Mr. Frazier's obsession with status and achievement might be useful to propel him out of intense states of despair and shame, it also "undermines [his] genuine psychological well-being and socioeconomic stability." As Dr. Francois writes:

> Ironically, his psychological defense style repeatedly recreates the very state of affairs he is attempting to flee. In spite of earning high salaries throughout his long professional career, Mr. Frazier has struggled to establish financial security. In an effort to project a certain image of himself, he generally lives above his means. He generally has limited savings to weather professional setbacks which in turn fuel risky

9

decision making in order to avoid homelessness and to continue maintaining his much-needed façade of being a high-status person. For example, once he obtained the PPP loans, he maintained his residence in Manhattan and also traveled to Florida and stayed in expensive hotels. He noted that socializing with the elite in Miami *"made me feel like somebody. I had Georgetown and Cornell credentials. I had arrived. Even though shame there, I can mask it. Now I have PPP, I don't have to stress of potential homelessness. I can take time and space to find a job. I can finally be a part of a culture that would not have accepted me if I didn't have the education and be able to afford this stuff."*

Ex. A at 6.

Unsurprisingly, Mr. Frazier is drawing connections between his own devastating lapse in judgment in this case and his father's devastating behavior against his mother and the rest of his family—and drawing parallels to his relationship with his own son. During his evaluation with Dr. Francois, Mr. Frazier "became tearful when he made the connection between how his father's actions tore his family apart when he was around four years old; and how he himself is recreating this history" as he faces the real prospect of a lengthy incarceration. Mr. Frazier is scared of revealing his present legal situation to his son:

*"He can no longer see me as a God. He can no longer talk to me with his friends. What he is going to see now is a criminal who couldn't be trusted. Someone who made bad choices. Now he's going to start lying like I lied about my parents. That's the worst part more than anything else."*

Ex. A at 6.

### D. Mr. Frazier enjoys a genuine and loving relationship with Kate O'Connor and their son, which gives him meaning and motivates him to use this case to turn his life around.

In June 2011, Mr. Frazier met a woman named Kate O'Connor in Washington, DC. At the time, Dr. O'Connor, a clinical immunologist and immunopathologist in Sydney, Australia, was presenting research from her PhD at a conference. Upon meeting Mr. Frazier, Dr. O'Connor formed an "immediate and lasting connection" with him (Ex. B at 1) that survived their physical separation and vastly different time zones. Mr. Frazier and Dr. O'Connor visited each other when possible, and he supported her through many challenges, including Dr. O'Connor's completion of her PhD and her sister's cancer diagnosis. Id.

10

Following a visit in November 2015, Dr. O'Connor discovered that she was pregnant. Both she and Mr. Frazier were thrilled. Although Mr. Frazier missed his son's birth because he was delivered a month early, he flew to Sydney as soon as he could and they spent a "blissful, sleepless time [together] as new parents." Ex. B at 1. Mr. Frazier was "loving, caring, and attentive." Id. In the years following, they visited each other when possible, but the significant time zone and geographical differences proved formidable.

At the beginning of 2020, Mr. Frazier and Dr. O'Connor planned for Mr. Frazier to make an extended visit to coincide with their son's fourth birthday in July. But as soon as COVID-19 disrupted international travel, they cancelled their plans. As Dr. O'Connor writes:



Mr. Frazier and his son celebrating his second birthday.

> The uncertainty of when we would be able to see each other was unsettling, along with the concern about falling ill that we all faced. I recall a conversation with Marcus early during our respective lock-downs; I was complaining about being exhausted with hours of stressful work at the hospital coupled with being a single parent. Usually, my parents travel to help me out periodically, but Australian national borders were also closed and I was facing an unknown period of work and single parenting. Although Marcus has always praised me and thanked me for being ▮▮▮▮'s mother, on this occasion, he said "but you have ▮▮▮▮ and I have nobody…." This is one of the rare occasions I have heard him complain. And he was right. I wouldn't have traded my place with him for anything, my five am wake ups or locked down weekends with ▮▮▮▮ baking, reading and endless Lego sessions. I can't envision missing out on hugging him or touching his little curls and soft cheeks for even a week.

Ex. B at 1-2.

11

It took Mr. Frazier more than a year to disclose the details of his case to Dr. O'Connor, as he was terrified that she would refuse to see him again. Of course, the news "was and still is extremely distressing" for Dr. O'Connor, who worries about Mr. Frazier's "well-being and future as well as the implications for [their] son." Ex. B at 2. Dr. O'Connor has also been reluctant to share news about Mr. Frazier's case with her close friends and family, which has impacted her mood and sleep and parenting. Worse, Dr. O'Connor has noticed a shift in her son's behavior. He struggled with the start of school this past February and "has experienced difficulty regulating his emotions," suffering from "recurrent episodes of anger or sadness." Id. For his part, Mr. Frazier has done everything he can to be present, available, and helpful from thousands of miles away. As Dr. O'Connor explains:



Mr. Frazier, Dr. O'Connor, and their son shortly after his birth.



> We have started seeing a child psychologist in the last few months. Marcus's support has been invaluable during this time. They have regular long FaceTime phone calls. Marcus has always remained patient, calm, loving and practical while discussing anger management solutions with ▇▇▇ over the phone. His regular input and contact has been encouraged by our psychologist. ▇▇▇ has requested to talk to his father about events at school, and there are times he does not want to share these conversations with me. I can't fathom to think if Marcus is incarcerated and ▇▇▇ is no longer able to have these conversations with his father, and I am unable to reach out when times are tough. I don't know how I would explain this to ▇▇▇ and I can't bear to think of the impact this change may make. I have wanted to travel to the US with ▇▇▇, but Australian international borders only opened six

12

months ago, and I worry about the trip causing further disruption to ▬'s start to the school.

Ex. B at 2.

Mr. Frazier "regularly apologises" to Dr. O'Connor for his actions. She knows that he feels "anguish at being unable to visit and support [their son] during this trying time." Ex. B at 2. Dr. O'Connor knows that Mr. Frazier feels especially guilty that it is no longer COVID-19 that is keeping them apart, but Mr. Frazier's case and his own poor decision-making. But Dr. O'Connor has also noticed something else: that Mr. Frazier's focus is not only on himself, but rather on the impact his actions will have on their son in the near and distant future. Dr. O'Connor has "witnessed a shift in Marcus's life goals." Id. Whereas he used to "prioritize his career achievements above all else," he is now focused on being "the best father he can be, to be present and watch [his son] grow into a fine young man." Ex. B at 2. Now, Mr. Frazier's long-term goal is to move to Australia as soon as it is permissible/possible. As Dr. O'Connor observes, "If devastating actions can have a silver lining, in this case, it has been for Marcus to not take fatherhood for granted." Id.

### E. Mr. Frazier has made an overwhelmingly positive adjustment to court supervision.

Following his arrest, Mr. Frazier readily accepted responsibility for his crimes and saved the Government significant time and resources by working out a plea agreement without Rule 16 discovery. Mr. Frazier also redoubled his employment efforts and obtained a consulting job at a firm in New York City, where he is making a decent salary and learning to live within his means. See Paystub, Exhibit D. He received a glowing performance review this past February, which described his overall performance as follows:

> Demonstrates a disciplined, reliable work ethic, and I am always responsive and available to my teams to provide support, key insights, ideas and direction. Displays an organized, thorough and efficient with time-management and mindful of deadlines. Begins each day fully refreshed and prepared for any challenges.

See Performance Review, Exhibit E. Mr. Frazier has also regularly attended alcoholics anonymous meetings through Sober Miracles (see, e.g., 2022 Attendance Sheet, Exhibit F) and regularly volunteers his Saturdays with the Coalition for the Homeless and the Robinhood Foundation, both of which are foodbanks. Critically, Mr. Frazier continues to participate in mental health treatment, and his most recent records are attached (Exhibit G).

13

## IV. A Sentence Of Time-Served Followed By 36 Months' Supervised Release, With One Year Of Home Detention, Is Sufficient But Not Greater Than Necessary To Satisfy The Statutory Goals Of Sentencing Under 18 U.S.C. § 3553(a)

Mr. Frazier's stipulated U.S. Sentencing Guidelines range of 63 to 78 months' imprisonment, while technically correct, is not a useful guide to an appropriate sentence in this case. In addition to Mr. Frazier's mitigating personal circumstances, legitimate criticism of the Guidelines' focus on (and calculation of) loss amounts in wire fraud cases compels a downward variance to a sentence of time-served followed by three-years' supervised release, including a year of home detention.

### A. The fraud guideline lacks any empirical or historical basis and does not warrant substantial deference at sentencing.

In considering the weight to be afforded to the Sentencing Guidelines in a particular case, in Kimbrough v. United States, 128 S. Ct. 558, (2007), the Supreme Court effectively recognized that not all guidelines are equal: while some "exemplify the Commission's exercise of its characteristic institutional role," others do not. Id. at 575. In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not [] an abuse of discretion for a district court to conclude when sentencing a particular defendant" that the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." Id.; see also, e.g., United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010). In Dorvee, the Second Circuit endorsed the authority of the district court to disagree with the Guidelines in child pornography cases based solely on policy considerations where the Guidelines are not based on empirical research and appear to be "irrational."

Indeed, in Rita v. United States, 551 U.S. 338 (2007), the Court reasoned that if a particular Guideline was originally based on past sentencing practices and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of §3553(a). Id. at 349. Conversely, when a Guideline is not developed according to this practice, there is less reason to believe that it embodies the statutory objectives and deserves deference, even in a mine-run case. Kimbrough, 552 U.S. at 109. Accordingly, district courts have routinely engaged in the process of scrutinizing presumptive Guidelines provisions, finding that many of them are not in fact the product of empirical research or national surveys of sentencing practices. See, e.g., United States v. Shipley, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (child pornography guideline); United States v. Galvez-Barrios, 355

14

F. Supp. 2d958, 962 (E.D. Wis. 2005) (illegal reentry guideline).

U.S.S.G. §2B1.l, the fraud guideline, is an example of one that is not based on historical sentencing practices or research. The history of §2B1.l shows the Guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrent efficacy or any other variable relevant to the purposes of sentencing. It was not even originally intended as a codification of past sentencing practices. To the contrary, it was written with the goal of increasing the severity of sentences over their historic levels. See United States v. Corsey, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("The loss guideline ... was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.").

The history of bracket inflation and the extraordinary emphasis on loss (which can be either actual or intended) renders the loss Guideline fundamentally flawed. Corsey, 723 F.3d at 380. For example, while imposing a below-guidelines sentence, Judge Rakoff noted in United States v. Adelson, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006), that the loss Guideline in fraud cases, in an effort to appear "objective," places great weight on putatively measurable quantities without explaining why it is appropriate to accord such weight to such factors. Indeed, and as the Sentencing Commission has detailed, so-called white collar offenders were historically more likely to receive probationary sentences. The Guidelines tried to modify this practice by making a greater number of white collar offenders subject to heightened prison terms. See U.S.S.C., Fifteen Years of Guidelines Sentencing vi-vii, 15, 44 (Nov. 2004). This deviation from past practices was a conscious but largely unjustified and inexplicable decision by the Commission, which opined that lengthier sentences were necessary to correct for past under punishment of theft and fraud, to make white-collar sentences "proportionate" to sentences for drug and violent crimes, and to effectuate greater deterrence. See id. at 55-56.

The Commission's stated reasons for amending the fraud Guideline simply do not justify imposing harsher sentences and more prison time on convicted fraudsters. Rather, the Commission's apparent rationale seems to directly contradict the statutory prescription that an individual be sentenced based on his own personal characteristics and his own offense, and that prison terms be the least amount necessary to punish the individual, promote respect for the law, and adequately account for the individual's specific physical and mental health needs.

With this in mind, there is no clear evidence that more severe sentences,

15

or the more frequent imposition of prison terms, actually provides for greater deterrence of crime. To the contrary, the weight of the evidence indicates that increasing the severity of sentences has little deterrent effect. See, e.g., Francis T. Cullen, et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 The Prison Journal 48S (2011); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006); David Weisburg et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).

In sum, the harsh sentences recommended under §2B1.1, based primarily on loss, are not historically or empirically based, and actually provide little verifiable benefit while imposing significant costs on the individual defendant and the community. See, e.g., United States v. Chavez, 230 F.3d 1089, 1092 (8th Cir. 2000) (Bright, J., concurring).

### 1. Section 2B1.1 overemphasizes loss amount.

Core to the criticism of relying on §2B1.1 as a lodestar in fraud cases is the Guideline's overemphasis on loss amount and a failure to recognize other factors that might more accurately capture an individual's culpability and/or the harm from his offense. See, e.g., United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (Rakoff, J.) (describing how fraud guidelines effectively ignore everything but the loss amount and that many of the resulting Guidelines - recommended sentences are "irrational on their face"); United States v. Ovid, 09 Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (criticizing§ 2B1.1 for failing to account for "many of the myriad factors that are properly considered in fashioning just sentences"); United States v. Musgrave, 647 F. App'x 529, 538-39 (6th Cir. 2016) (explaining that "there is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances").

A study by The American Bar Association Task Force On The Reform Of Federal Sentencing for Economic Crimes, recommended vast changes to the fraud Guideline. The Task Force included Second Circuit Judge Gerard Lynch, Southern District Judge Jed S. Rakoff, and former Eastern District Judge John Gleeson. See Defense Exhibit H. As a preface to the Report, Task Force members reached a consensus that the current structural framework for the fraud Guideline "can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are lesseasily quantified." The recommendations included a dramatic decrease in the emphasis on loss (e.g., instead of the 18-level enhancement for an approximately $6 million "loss"

16

amount, PSR at ¶55, Mr. Frazier would face a 10-level enhancement for the amount), and a greater emphasis on other 3553(a) factors. Id.

### 2. A sentence below Probation's Guidelines range is also necessary to avoid an unwarranted sentencing disparity with comparable cases.

The Court must consider a number of factors in imposing a sentence that is "sufficient, but not greater than necessary" to meet the goals of the Sentencing Reform Act. 18 U.S.C. §3553(a). One consideration is "the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). The Second Circuit has found that this section requires a District Court to consider nationwide sentence disparities. United States v. Ghailani, 733 F.3d 29, 55 (2d Cir. 2013). Accordingly, the Court should consider the following sentences imposed in cases involving PPP loan fraud:

a. United States v. Butziger, 20 Cr. 72 MSM-LDA (D.R.I.). One of the first in the country to face PPP loan fraud charges, the defendant was accused of obtaining $543,959 in forgivable loans. The Government sought 21 months' imprisonment, and the Court sentenced the defendant to time-served followed by three years' supervised release and six months' home detention;
b. United States v. Jenison, 21 Cr. 90 ALM (S.D. Oh.). Defendant pleaded guilty to three counts of wire fraud in connection with her applications for nearly $300,000 in COVID-19 relief loans. The Government sought 21 months imprisonment, but the Court sentenced the defendant to five years' probation, a $250,000 fine, and almost $130,000 in restitution.
c. United States v. VanScoyk, 21 Cr. 1620 JCH-BGM (D. Ariz.). The defendant pleaded guilty to conspiring to fraudulently obtain over $1.2 million in PPP loans. The Government sought a prison term, and the defendant was sentenced to two years' probation (one of his co-defendants received 10 months' imprisonment, the other eight months).

### B. Given the totality of the circumstances, a non-incarceratory sentence of time-served, one-year home detention, and 36 months of supervised release is sufficient to punish Mr. Frazier and promote respect for the law.

There is no dispute that, of the PPP loans Mr. Frazier ultimately obtained fraudulently, the bulk of the money he acquired was seized from his bank accounts upon his arrest. There can also be no dispute that, throughout his life, Mr. Frazier has struggled with depression and that his "characterological response to his

17

history of relational trauma includes vulnerable self-esteem, deep sense of shame, feelings of inferiority, need for admiration and status, shallow interpersonal relationships used mainly to bolster a fragile self, poor emotion regulation, deficits in judgment, and engaging in self-destructive behaviors." Ex. A at 7-8. Against this backdrop, and given the unmistakable connection between his offense conduct and mental health struggles, Mr. Frazier needs more treatment—not prison. Dr. Francois has identified Brooklyn Minds as a facility well equipped to provide Mr. Frazier with the mentalization-based therapy and dialectical behavior therapy he would benefit from, and notes that he is highly motivated to change the course of his life. Ex. A at 8. The Court can confirm as much through, inter alia, Dr. O'Connor's thoughtful and impassioned letter, and Mr. Frazier's commitment to therapy, his outstanding performance at his new job, and his scrupulous compliance with the terms of his pre-trial release.

There is no doubt that Mr. Frazier must be punished for his crimes. Forcing him to endure three more years of court supervision, with the first year spent on home detention, is sufficient, but not greater than necessary, to achieve this goal, particularly given the $250-per-month restitution payments Mr. Frazier must make for the next 20 years. Such a sentence also adequately accounts for Mr. Frazier's lack of a criminal history, positive trajectory, and the unnecessary collateral consequences a term of imprisonment would have on his son and co-parent.

## V.    Conclusion

For the reasons stated herein and for any that are apparent at Mr. Frazier's July 18, 2022, sentencing proceeding, the Court should sentence Mr. Frazier to time-served followed by three years' supervised release, including a year of home detention.

Respectfully Submitted,

Andrew J. Dalack, Esq.
Assistant Federal Defender

Cc:   Government Counsel                    Counsel for Marcus Frazier

18